**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AARON L. PETERSON,<br><br>Plaintiff,<br>v.<br><br>REBEKAH KATHERINE BREWIS,<br><br>Defendant. | Case No. |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 1

A. THE PARTIES ENTERED INTO A SETTLEMENT AGREEMENT IMPOSING MUTUAL CONFIDENTIALITY, NON-PUBLICATION, NO-CONTACT, AND NON-DISPARAGEMENT OBLIGATIONS. ..... 1

B. DEFENDANT HAS PUBLISHED AT LEAST TWELVE POSTS TARGETING PLAINTIFF IN FLAGRANT VIOLATION OF THE SETTLEMENT AGREEMENT. ..... 4

III. LAW AND ARGUMENT ..... 6

A. LEGAL STANDARD ..... 6

B. IN THE ABSENCE OF A PRELIMINARY INJUNCTION, PLAINTIFF WILL SUFFER IRREPARABLE HARM FOR WHICH TRADITIONAL LEGAL REMEDIES ARE INADEQUATE. ..... 6

C. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM ..... 8

D. THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF. ..... 10

E. THE PUBLIC INTEREST WILL BE SERVED BY INJUNCTIVE RELIEF. ..... 11

F. NO BOND SHOULD BE REQUIRED UNDER RULE 65(C). ..... 12

IV. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Mead Johnson & Co.*,
971 F.2d 6 (7th Cir. 1992) ....................6

*Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*,
No. 96 C 8363, 1997 WL 24737 (N.D. Ill. Jan. 17, 1997) ....................11

*Brewis v. Peterson Farms Fresh, LLC*,
No. 1:25-cv-03513, ECF No. 77 (N.D. Ill. June 22, 2026)....................4, 9

*Brosnan Risk Consultants, Ltd. v. Murauskas*,
No. 22 CV 2995, 2022 WL 18670860 (N.D. Ill. June 13, 2022)....................11

*Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*,
14 F.4th 624 (7th Cir. 2021) ....................6

*Cook Inc. v. Bos. Sci. Corp.*,
No. 01 C 9479, 2002 WL 31236289 (N.D. Ill. Oct. 1, 2002), *aff'd as modified*,
333 F.3d 737 (7th Cir. 2003) ....................11

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
31 F.3d 506 (7th Cir. 1994) ....................7

*Foodcomm Int'l v. Barry*,
328 F.3d 300 (7th Cir. 2003) ....................6, 10

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) ....................12

*Hanna v. Plumer*,
380 U.S. 460 (1965)....................6

*Hastings Mut. Ins. Co. v. Safety King, Inc.*,
286 Mich. App. 287, 778 N.W.2d 275 (2009)....................9

*Life Spine, Inc.* v. *Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ....................6, 7, 10

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
616 F.2d 1006 (7th Cir. 1980) ....................11

*Monster Energy Co. v. Wensheng*,
136 F. Supp. 3d 897 (N.D. Ill. 2015) ....................12

*Mosley v. City of Chicago*,
252 F.R.D. 421 (N.D. Ill.), *order vacated in part on reconsideration sub nom. Mosley v. City of Chicago*, 252 F.R.D. 445 (N.D. Ill. 2008) ....................................................7

*Promatek Indus., Ltd. v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) ..........................................................................................7, 10

*Randall v. Port Huron, St. C. & M.C. Ry. Co.*,
215 Mich. 413, 184 N.W. 435 (1921)...................................................................................9

*Reicher v. SET Enters., Inc.*,
283 Mich. App. 657, 770 N.W.2d 902 (2009)......................................................................9

*Reid L. v. Illinois State Bd. of Educ.*,
289 F.3d 1009 (7th Cir. 2002) .............................................................................................11

*SKF USA, Inc. v. Bjerkness*,
636 F. Supp. 2d 696 (N.D. Ill. 2009) ....................................................................................7

*SMC Corp. v. Lockjaw, LLC*,
481 F. Supp. 2d 918 (N.D. Ill. 2007) ..................................................................................11

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
695 F.3d 676 (7th Cir. 2012) ...............................................................................................7

*Ty, Inc. v. Jones Grp., Inc.*,
237 F.3d 891 (7th Cir. 2001) ...............................................................................................6

*Van Buren Charter Twp. v. Visteon Corp.*,
319 Mich. App. 538, 904 N.W.2d 192 (2017)......................................................................9

*Williams v. First Nat. Bank*,
216 U.S. 582, 30 S. Ct. 441, 54 L. Ed. 625 (1910)..............................................................11

**Other Authorities**

Rule 65(c)...........................................................................................................................12

# I. INTRODUCTION

This case arises out of the deliberate and ongoing violations of a negotiated Settlement Agreement and Amended and Restated Mutual Confidentiality Agreement (the "Agreement") by Defendant Rebekah Katherine Brewis ("Ms. Brewis" or "Defendant"). Plaintiff Aaron L. Peterson ("Mr. Peterson") entered into the Agreement with Ms. Brewis to resolve prior litigation, paying her $25,000 in exchange for a mutual release and her commitment to robust confidentiality, non-publication, no-contact, and non-disparagement covenants. This Court has already confirmed the Agreement's validity, denying Ms. Brewis's attempts to set it aside. Yet barely six months after pocketing the settlement funds, Ms. Brewis has launched a public website through which she has systematically flouted nearly every obligation the Agreement imposes—publishing at least twelve articles that identify Mr. Peterson by name, disclose the settlement's existence and terms, and level baseless and deeply injurious accusations against Mr. Peterson.

Ms. Brewis's campaign shows no signs of stopping—she continues to post new content, compounding the damage to Plaintiff's reputation and permanently undermining the confidentiality protections for which they bargained. Because the Agreement itself recognizes that monetary damages cannot adequately remedy these harms and entitles the non-breaching party to injunctive relief, Plaintiff respectfully requests that this Court enforce the Agreement and put a stop to Ms. Brewis's violations before they inflict further irreparable injury.

# II. FACTUAL BACKGROUND

## A. The Parties Entered Into A Settlement Agreement Imposing Mutual Confidentiality, Non-Publication, No-Contact, And Non-Disparagement Obligations.

In connection with prior federal litigation between the parties, Plaintiff and Defendant voluntarily entered into the Agreement, effective October 10, 2025. Compl. ¶ 11; Agreement, Compl. Ex. A. Under the Agreement, Defendant resolved her claims against Mr. Peterson in

exchange for a payment of $25,000. Compl. ¶ 12; *see* Agreement § 1, Compl. Ex. A. The Agreement also provided for a mutual release of all claims and dismissal of the prior litigation with prejudice. *Id.*; *see* Agreement §§ 2, 8, Compl. Ex. A. Mr. Peterson fulfilled his payment obligation in full and within the time required by the Agreement, and Defendant acknowledged receipt of the settlement funds. *Id.* ¶¶ 12–13.

In addition to the mutual release and payment, the Agreement imposes several ongoing obligations on the parties. Compl. ¶ 14. Most significantly, the Agreement establishes robust confidentiality obligations. Section 3(a) requires the parties to protect all "Confidential Information" of the other party, a term the Agreement defines broadly to encompass:

> any and all information, data, records, statements, specifications related to Disclosing Party, any relationships that the Disclosing Party has had in the past or is considering (including any relationship between the Parties) and any prior communications between or relating to the Parties, including, phone calls, videos, text messages, emails, photos or other recordings or videos related to, or referencing, Disclosing Party or the Parties . . . and . . . the fact that the Parties have entered into this Agreement or that Disclosing Party has provided any information to the Receiving Party.

Agreement § 3(a), Compl. Ex. A. Critically, this definition encompasses not only the substance of the parties' prior relationship and communications, but also the very existence of the Agreement itself. *Id*. Section 3(b) reinforces this obligation by providing that each party shall "keep all of the Disclosing Party's Confidential Information strictly confidential" and shall "not, directly or indirectly, disclose or make available, in whole or in part, any of the Disclosing Party's Confidential Information to any other person (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages)." *Id*. § 3(b).

Beyond confidentiality, the Agreement separately prohibits Defendant from publishing any internet or social media content referencing Mr. Peterson. Section 5(a) provides that, from and

after the Effective Date, "Brewis shall not make, or cause or encourage any third party to make, any further internet or social media posts or content referencing, directly or indirectly, Peterson or the Peterson Entities." *Id*. § 5(a). This prohibition is absolute and unconditional. *Id*.

The Agreement further bars Defendant from directly or indirectly contacting Mr. Peterson or any person or entity associated with Mr. Peterson. Under Section 5(c), Defendant agreed not to:

> directly or indirectly, contact (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages) Peterson or any person or entity related to or known by Peterson or the Peterson Entities, including, without limitation, any family member, friend, colleague or business relationship of Peterson or any employee, representative, consultant, customer or vendor of any entity to which Peterson is associated, including the Peterson Entities.

*Id*. § 5(c).

The Agreement also includes a comprehensive non-disparagement covenant. Section 5(e) requires the parties to refrain from communicating, "orally, or in writing, or by any other manner whatsoever," and from causing or encouraging any third party to communicate:

> any disparaging, damaging, criticizing, or injurious claim, remark, allegation, statement, opinion, comment, innuendo or information of any kind or nature whatsoever, the effect or intention of which is to cause embarrassment, damage, or injury to the reputation, business, or standing in the community to the other Parties, regardless of whether any such communication is or may be true or founded in facts.

*Id*. § 5(e).

Finally, the parties expressly acknowledged that monetary damages alone would be insufficient to remedy a breach of the Agreement. Section 9 provides that "[e]ach Party hereby acknowledges that a violation by it of this Agreement would result in irreparable harm to the non-breaching Party,… that damages may be an inadequate remedy," and that the non-breaching party "shall be entitled to equitable relief, including, without limitation, the right to obtain an injunction to secure the specific performance of this Agreement and/or to prevent a breach or contemplated

breach of this Agreement, without any requirement that such non-breaching Party post a bond as a condition of such relief." *Id*. § 9.

Notably, the validity of the Agreement has already been tested and confirmed. This Court recently denied Defendant's motions to set aside the Agreement and vacate the dismissal of the prior litigation, notwithstanding Defendant's allegations of fraud, illegality, and unconscionability. *See Brewis v. Peterson Farms Fresh, LLC*, No. 1:25-cv-03513, ECF No. 77 (N.D. Ill. June 22, 2026). As such, the case remains closed. *Id*.

### B. DEFENDANT HAS PUBLISHED AT LEAST TWELVE POSTS TARGETING PLAINTIFF IN FLAGRANT VIOLATION OF THE SETTLEMENT AGREEMENT.

Beginning in or around April 2026—less than six months after executing the Agreement and accepting $25,000 in settlement funds—Defendant launched a Substack, a publicly accessible online publishing platform (the "Website"). Compl. ¶ 21. In the months that followed, Defendant has authored at least twelve separate publications on the Website as part of a sustained campaign targeting Mr. Peterson, directly and repeatedly referencing Mr. Peterson by name. *Id*. Mr. Peterson does not intend to dignify Defendant's baseless accusations by recounting them in detail here, but the content of even a representative sample of these publications speaks for itself. *See* April 7, 2026, "Jesus Turns Oil Into Organic Blueberry Juice," **Exhibit A**; June 18, 2026, "Michigan State Capture," **Exhibit B**; June 18, 2026, "The Case Is the Mechanism," **Exhibit C**; June 18, 2026, "The Week Everything Hit at Once," **Exhibit D**.

The posts are wide-ranging in subject matter, but uniform in their disregard for Defendant's obligations under the Agreement. *See* Exs. A–D. For example, Defendant's April 7, 2026 publication makes disparaging allegations concerning the business practices and reputation of the Peterson Entities and directs accusations at members of Mr. Peterson's family. Ex. A. A subsequent article goes so far as to attempt to connect Mr. Peterson and the Peterson Entities to

international organized crime networks and high-profile criminal figures. Ex. B. Defendant also published content that repeatedly references the prior litigation and expressly solicits third parties to take legal action against Plaintiff. Ex. C. And in a separate post, Defendant discloses the existence and terms of the settlement between the parties, stating that "Peterson settlement funds were deposited in October 2025" and characterizing the Agreement as a "$25,000 settlement." Ex. D.

Defendant's publications constitute clear, repeated, and deliberate violations of each of the Agreement's core restrictive covenants. Defendant has disclosed Confidential Information as defined in the Agreement—including the very existence of the Agreement, the amount of the settlement payment, and details of the prior litigation between the parties—in direct contravention of Sections 3(a) and 3(b). Compl. ¶ 22. Every identified publication constitutes internet content that directly references Mr. Peterson, in contravention of the absolute prohibition contained in Section 5(a). *Id.* ¶ 23; *see* Exs. A–D. Through the Website, Defendant has further directed communications to and concerning third parties associated with Plaintiff, including Plaintiff's legal counsel and business relationships, in contravention of Section 5(c). *Id.* ¶ 24; *see* Exs. A, C. And Defendant has published deeply damaging and injurious accusations concerning Plaintiff, including baseless allegations of serious criminal conduct, the clear effect and intention of which is to cause embarrassment, damage, and injury to the reputation, business, and standing in the community of Plaintiff, in contravention of Section 5(e). *Id.* ¶ 25; *see* Exs. A–D.

As of the date of this filing, the Website and all of the content described above remains publicly accessible. Compl. ¶ 26; *see* Exs. A–D. Defendant continues to publish new content referencing Mr. Peterson. *Id.* Accordingly, Defendant's conduct is a deliberate and escalating campaign of violations that shows no signs of abating.

## III. LAW AND ARGUMENT

### A. LEGAL STANDARD

Federal courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). Accordingly, while federal law supplies the standard for preliminary injunctive relief, the Court must apply substantive Michigan law pursuant to the choice of law clause in the Agreement. *See* Agreement § 13, Compl. Ex. A.

In the Seventh Circuit, a party seeking a preliminary injunction must first show that "(1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to remedy the harm, and (3) they have some likelihood of success on the merits." *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). "If those elements are shown, the court must then balance the harm the moving parties would suffer without an injunction against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties." *Id.*

### B. IN THE ABSENCE OF A PRELIMINARY INJUNCTION, PLAINTIFF WILL SUFFER IRREPARABLE HARM FOR WHICH TRADITIONAL LEGAL REMEDIES ARE INADEQUATE.

Harm is irreparable if legal remedies are "seriously deficient as compared to the harm suffered." *Life Spine, Inc.* v. *Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (citing *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Intangible harms are presumed irreparable because "it is virtually impossible to ascertain the precise economic consequences" of such injuries. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *see also Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). Indeed, it is well-established that loss of

goodwill and reputation, in particular, can constitute irreparable harm. *Life Spine*, 8 F.4th at 546; see also *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012).

Here, Defendant has published at least twelve posts on a publicly accessible website containing baseless accusations of serious criminal conduct against Mr. Peterson. Compl. ¶¶ 22–25; *see* Exs. A–D. These publications inflict harm on multiple fronts. They strike at Mr. Peterson's personal reputation by associating him with criminal conduct in the eyes of a public audience. They simultaneously undermine the business goodwill of the Peterson Entities by impugning the integrity of their operations and relationships. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (recognizing that harm to consumer goodwill constitutes irreparable injury); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) (finding irreparable harm from damage to commercial reputation and loss of sales and opportunities to maintain and develop customer relationships). No damages award can undo the reputational harm caused by accusations of criminal conduct disseminated to a public audience, nor can it quantify the erosion of business relationships and goodwill that compounds each day these publications remain accessible online. Indeed, the Supreme Court has recognized that the interest in preserving one's reputation is "of enormous significance." *Mosley v. City of Chicago*, 252 F.R.D. 421, n.12 (N.D. Ill.), *order vacated in part on reconsideration sub nom. Mosley v. City of Chicago*, 252 F.R.D. 445 (N.D. Ill. 2008) (citing *Meese v. Keene*, 481 U.S. 465, 107 S. Ct. 1862, 95 L. Ed. 2d 415 (1987)).

Moreover, independent of any reputational injury, Mr. Peterson faces additional harm resulting from Defendant's unauthorized disclosure of confidential information. Indeed, courts have recognized that "[d]isclosure of confidential information . . . can constitute irreparable harm." *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 715 (N.D. Ill. 2009). Here, Defendant has

publicly disclosed the very existence of the Agreement, the amount of the settlement payment, details of the prior litigation between the parties, and information concerning Mr. Peterson's personal and business relationships. All of this constitutes "Confidential Information" expressly protected under Sections 3(a) and 3(b). Compl. ¶ 22; *see* Agreement §§ 3(a)–(b), Compl. Ex. A. This information is now publicly available, indexed by search engines, and subject to ongoing dissemination across social media platforms, placing it permanently beyond recall or remedy.

Notably, the parties themselves anticipated this very result when they executed the Agreement. Section 9 of the Agreement provides that "[e]ach Party hereby acknowledges that a violation by it of this Agreement would result in irreparable harm to the non-breaching Party, and that damages may be an inadequate remedy." Agreement § 9, Compl. Ex. A. This contractual acknowledgment, made at arm's length at the time of contracting, confirms that both parties understood the harms now facing Plaintiff could not be adequately remedied through an award of monetary damages.

Finally, the nature of Defendant's conduct confirms that without this Court's intervention, the irreparable harm to Plaintiff will only intensify. Defendant has maintained a sustained and accelerating pattern of violations since April 2026, with no indication of voluntary cessation. Compl. ¶ 26. Each additional publication deepens the injury to Plaintiff's reputation and further compromises the confidentiality protections of the Agreement, making immediate relief imperative.

### C. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

Under Michigan law, a party claiming a breach of contract must establish "the existence and terms of a contract, that the defendant breached its terms, and that the breach caused damages

to the plaintiff." *Van Buren Charter Twp. v. Visteon Corp.*, 319 Mich. App. 538, 554, 904 N.W.2d 192 (2017). Here, Plaintiff readily satisfies each element.

First, the Agreement is a valid and enforceable contract. *See Reicher v. SET Enters., Inc.*, 283 Mich. App. 657, 665, 770 N.W.2d 902 (2009) ("A settlement agreement is a binding contract."). The parties voluntarily entered into the Agreement, effective October 10, 2025, to resolve prior litigation between them. Compl. ¶ 11; Agreement, Compl. Ex. A. Defendant resolved her claims against Plaintiff in exchange for $25,000, and the Agreement further provided for a mutual release of all claims and dismissal of the prior action with prejudice. Compl. ¶ 12; Agreement §§ 1, 2, 8, Compl. Ex. A. Indeed, the enforceability of the Agreement is beyond dispute—this Court recently denied Defendant's motions to vacate the Agreement and set aside the dismissal of the prior litigation, rejecting Defendant's allegations of fraud, illegality, and unconscionability. *See Brewis v. Peterson Farms Fresh, LLC*, No. 1:25-cv-03513, ECF No. 77 (N.D. Ill. June 22, 2026). As such, the Agreement is a valid and binding contract that this Court is obligated to enforce. *See Randall v. Port Huron, St. C. & M.C. Ry. Co.*, 215 Mich. 413, 423, 184 N.W. 435 (1921) ("The law favors settlements made by parties. When made, they are binding until rescinded for cause").

Next, Defendant has materially breached the Agreement. The Agreement's restrictive covenants are unambiguous, therefore their terms must be given their plain and ordinary meaning. *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich. App. 287, 778 N.W.2d 275 (2009). Applying those terms here, Defendant's conduct constitutes clear, repeated, and deliberate violations of each of the Agreement's core provisions. Barely six months after executing the Agreement and accepting $25,000 in settlement funds, Defendant launched a publicly accessible website on which she has authored at least twelve publications that directly and repeatedly identify Mr. Peterson and

the Peterson Entities by name—in plain violation of the absolute prohibition in Section 5(a). Compl. ¶¶ 21, 23; Agreement § 5(a), Compl. Ex. A; *see* Exs. A–D. Defendant has disclosed the existence and terms of the Agreement, the settlement payment amount, and details of the prior litigation, all of which fall squarely within the Agreement's broad definition of "Confidential Information" protected under Sections 3(a) and 3(b). Compl. ¶ 22; *see* Ex. D; Agreement §§ 3(a)–(b), Compl. Ex. A. Through her posts, Defendant has directed communications to and concerning persons associated with Plaintiff—including his legal counsel and business relationships—in contravention of the no-contact provision of Section 5(c). Compl. ¶ 24; *see* Exs. A, C. And Defendant has published deeply injurious accusations concerning Plaintiff, including baseless allegations of serious criminal conduct, the manifest effect and intention of which is to cause embarrassment, damage, and injury to the reputation, business, and community standing of Plaintiff, in contravention of the non-disparagement covenant of Section 5(e). Compl. ¶ 25; *see* Exs. A–D. Simply put, Defendant has violated nearly every material restriction the Agreement imposes. An as a direct and proximate result of Defendant's numerous breaches, Plaintiff has suffered and continue to suffer significant injury. Compl. ¶¶ 22–25; *see Life Spine*, 8 F.4th at 546; *Promatek Indus.*, 300 F.3d at 813.

Accordingly, Plaintiff has demonstrated a clear likelihood of success on the merits of their breach of contract claim.

### D. The Balance Of Harms Favors Injunctive Relief.

"In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." *Foodcomm Int'l*, 328 F.3d at 305. Here, denying injunctive relief would permit Defendant to continue inflicting irreparable reputational and business harm on Plaintiff with

impunity. By contrast, there is no cognizable harm to Defendant in being required to comply with the contractual obligations she voluntarily undertook. See *Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 WL 24737 at *5 (N.D. Ill. Jan. 17, 1997) ("There is no harm to Miller by forcing her to comply with the terms of her contract with Arcadia…[s]he is simply getting that for which she bargained and only being denied that to which she has no right."); *Brosnan Risk Consultants, Ltd. v. Murauskas*, No. 22 CV 2995, 2022 WL 18670860 at *1 (N.D. Ill. June 13, 2022) ("There is no harm to Murauskas and Boston in being required to comply with their pre-existing obligations."). The balance of harms thus weighs decidedly in favor of injunctive relief.

### E. THE PUBLIC INTEREST WILL BE SERVED BY INJUNCTIVE RELIEF.

"Finally, the court must consider the interest of and harm to nonparties from a denial or grant of the injunction." *Reid L. v. Illinois State Bd. of Educ.*, 289 F.3d 1009, 1021 (7th Cir. 2002). Courts in this District have recognized that the public interest is served by enforcing valid contracts. *See SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007); *Cook Inc. v. Bos. Sci. Corp.*, No. 01 C 9479, 2002 WL 31236289 at *6 (N.D. Ill. Oct. 1, 2002), *aff'd as modified*, 333 F.3d 737 (7th Cir. 2003). This principle applies with particular force to settlement agreements, which are highly favored and to be enforced whenever possible. See *Williams v. First Nat. Bank*, 216 U.S. 582, 595, 30 S. Ct. 441, 54 L. Ed. 625 (1910); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980). An injunction enforcing the agreement would serve these interests by holding the parties to the bargain they voluntarily struck, and there is no countervailing public interest in permitting Defendant to disregard her contractual obligations. Accordingly, this factor weighs in favor of injunctive relief.

### F. No Bond Should Be Required Under Rule 65(c).

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The rule, however, grants discretion to the district court to determine whether a bond is appropriate and, if so, in what amount. *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015) ("The appropriate amount of the bond is subject to the court's discretion."). Courts may waive the bond requirement altogether where, as here, there is "no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

A bond is unnecessary in this case. The relief Plaintiff seeks would do no more than hold Defendant to the restrictive covenants she agreed to as part of a negotiated settlement—obligations from which she has no right to be excused. Defendant therefore faces no realistic prospect of harm warranting the protections of Rule 65(c). The Agreement itself reinforces this conclusion: Section 9 expressly provides that the non-breaching party is entitled to injunctive relief "without any requirement that such non-breaching Party post a bond as a condition of such relief." Agreement § 9, Compl. Ex. A. In light of the absence of any potential injury to Defendant and the parties' own contractual understanding that no bond should be imposed, the Court should exercise its discretion to waive the bond requirement entirely.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that his Motion for Preliminary Injunction be granted.

Dated: July 13, 2026

Respectfully submitted,

**AARON L. PETERSON**

By: /s/ Michael J. Grant
One of His Attorneys

Brion B. Doyle (P67870)
Neil E. Youngdahl (P82452)
VARNUM LLP
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
bbdoyle@varnumlaw.com
neyoungdahl@varnumlaw.com
*Pro hac vice application forthcoming*

Michael J. Grant (#6275028)
John H. Andreasen (#6332408)
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle Street, Suite 700
Chicago, IL 60604
(312) 762-9450
Firm No. 38234
mgrant@tdrlaw.com
jandreasen@tdrlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 13, 2026, the undersigned caused a true and correct copy of the foregoing **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** to be filed with the Clerk of Court for the United States District Court for the Northern District of Illinois using the CM/ECF system. Notice and a copy of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system. The undersigned also caused true and correct copies to be served on the party(s) listed below via personal service:

Rebekah Katherine Brewis
2751 Ogden Ave, RM 234
Downers Grove, IL 60515-1704

/s/ Michael J. Grant